1  MILBERG WEISS BERSHAD
      HYNES & LERACH LLP
2  PATRICK J. COUGHLIN (111070)
   100 Pine Street, Suite 2600
3  San Francisco, CA  94111
   Telephone:  415/288-4545
4  415/288-4534 (fax)
      – and –
5  WILLIAM S. LERACH (68581)
   DARREN J. ROBBINS (168593)
6  401 B Street, Suite 1700
   San Diego, CA  92101
7  Telephone:  619/231-1058
   619/231-7423 (fax)
8
   FARUQI & FARUQI, LLP
9  NADEEM FARUQI
   320 East 39th Street
10 New York, NY  10016
   Telephone:  212/983-9330
11 212/983-9331 (fax)

12 Attorneys for Plaintiff

13                    UNITED STATES DISTRICT COURT

14                   NORTHERN DISTRICT OF CALIFORNIA

15 JACK SPERLING, On Behalf of Himself and ) No.
   All Others Similarly Situated,          )
16                                          ) CLASS ACTION
                             Plaintiff,     )
17                                          ) COMPLAINT FOR VIOLATION OF THE
          vs.                               ) FEDERAL SECURITIES LAWS
18                                          )
   TIER TECHNOLOGIES, INC., JAMES L.        )
19 BILDNER, LAURA B. DEPOLE and             )
   STEPHEN MCCARTY,                         )
20                                          )
                             Defendants.    )
21 _____ ) DEMAND FOR JURY TRIAL

22

23

24

25

26

27

28

**INTRODUCTION**

1.     This is an action on behalf of purchasers of Tier Technologies, Inc. ("Tier" or the "Company") publicly traded securities during the period from April 30, 2002 to November 10, 2003 (the "Class Period").  Tier provides information technology consulting, application development and software engineering services that facilitate the migration of clients' enterprise-wide systems.

2.     During the Class Period, defendants caused Tier's shares to trade at artificially inflated levels through the issuance of false and misleading financial statements.  As a result, the Company's shares traded at inflated prices.

**JURISDICTION AND VENUE**

3.     The claims asserted arise under §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("1934 Act").  Jurisdiction is conferred by §27 of the 1934 Act.  Venue is proper pursuant to §27 of the 1934 Act as defendant Tier and/or the individual defendants conduct business in and the wrongful conduct took place in this District.

**THE PARTIES**

4.     Plaintiff Jack Sperling purchased Tier publicly traded securities as detailed in the attached Certification and was damaged thereby.

5.     Defendant Tier provides information technology consulting, application development and software engineering services that facilitate the migration of clients' enterprise-wide systems.

6.     Defendant James L. Bildner was Chairman and CEO of the Company.

7.     Defendant Laura B. DePole ("DePole") was the CFO of the Company.  During the Class Period, DePole signed the form 10-Qs verifying the accuracy of the financial statements.  Moreover, DePole sold 20,000 of her Tier shares at artificially inflated prices during the Class Period.

8.     Defendant Stephen McCarty was Vice President of the Company.  During the Class Period, McCarty took advantage of the artificial inflation in the Company's shares and sold 121,218 of his own Tier shares.

1        9.     Defendants Bildner, DePole and McCarty are the "Individual Defendants." They are

2 liable for the false statements pleaded in ¶¶14, 16, 18, 20-21 and 23, as those statements were

3 "group-published" information.

4           **SCIENTER AND FRAUDULENT SCHEME AND COURSE OF BUSINESS**

5        10.    During the Class Period, each of the Individual Defendants occupied a position as one

6 of the top Tier executives and was privy to non-public information concerning the Company. Each

7 of them knew of the adverse facts specified herein. Moreover, each created incentives for the

8 Company's employees to help them inflate the Company's revenue. Tier's press releases, corporate

9 reports to shareholders, and filings with the SEC were each group-published documents for which

10 each defendant is equally responsible.

11       11.    Each of the Individual Defendants and Tier is liable for making false and misleading

12 statements in that they inflated the prices of Tier securities by making false and misleading

13 statements and omitting material adverse information. The defendants' wrongful course of business

14 (i) artificially inflated the prices of Tier's securities during the Class Period; (ii) deceived the

15 investing public, including plaintiff and other Class members, into acquiring Tier's securities at

16 artificially inflated prices; (iii) allowed certain of the defendants to sell 141,218 Tier shares for

17 proceeds of more than $2.4 million; and (iv) permitted Tier to grow and benefit economically from

18 the wrongful course of conduct.

19       12.    Tier and its top officers inflated the prices of the Company's securities in order to

20 pursue an accelerated securities sale program. Defendants knew that by concealing Tier's true

21 financial results they could foster the perception in the business community that Tier was a "growth

22 company," *i.e.,* it was the only way Tier could post the revenue and earnings per share ("EPS")

23 growth claimed by defendants.

24        **FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD**

25       13.    On April 30, 2002, the Company issued a press release entitled "Tier Reports Results

26 From Continuing Operations of $0.15 Pro Forma Diluted EPS And Revenues of $22.1 Million for

27 Second Fiscal Quarter." The press release stated in part:

28

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS         - 2 -

Tier Technologies, Inc. today announced results for the second fiscal quarter ended March 31, 2002.

Revenues from continuing operations for the second quarter fiscal 2002 were $22.1 million as compared to $26.4 million in the quarter ended March 31, 2001. Excluding revenues under the Siemens Business Service Alliance in the U.K. which are winding down, revenues for the second fiscal quarter were $21.8 million as compared to $20.2 million in the prior year quarter. Pro forma operating income from continuing operations for the second fiscal quarter increased 33% to $3.9 million as compared to $3.0 million in the prior year quarter. Pro forma net income and pro forma diluted earnings per share from continuing operations were $2.8 million and $0.15, respectively, compared to $2.0 million and $0.15, respectively, in the prior year quarter.

As announced on April 10, 2002, Tier has decided to sell its Australian operations. The results of Australian operations and the estimated future operating losses and loss on the sale have been presented as a discontinued operation, and current and prior year results from continuing operations exclude the impact of Australian operations for comparative purposes.

\*       \*       \*

The net loss and the net loss per diluted share from discontinued operations for the second fiscal quarter ended March 31, 2002 was $16.1 million and $0.83, respectively, as compared to a net loss and net loss per diluted share from discontinued operations in the prior year quarter of approximately $400,000 and $0.03, respectively. The net loss from discontinued operations of $16.1 million includes the second fiscal quarter's net loss from the discontinued operations of $1.0 million, an estimated net loss on sale of approximately $14.4 million and estimated future net losses from discontinued operations up to the date of sale of approximately $700,000.

\*       \*       \*

Bildner added, "As we look beyond this quarter, we are pleased with our near and long term project backlog and pipeline opportunities. We expect to see significant growth in both our top and bottom line in the next few quarters and into the next fiscal year, as we continue to penetrate our core vertical markets. In particular, we are optimistic about our opportunities in the state and local child support and pension markets, and our recently acquired government financial services practice. *We see continuing demand for these services over the next several years. In addition, we are excited about the opportunities in our healthcare practice, as the industry enters the countdown to HIPAA privacy compliance in 2003.*"

\*       \*       \*

**OUTLOOK**

Bildner added, "Looking ahead for the balance of the fiscal year, we expect revenue from continuing operations to be approximately $26 million to $27 million with pro forma diluted earnings per share from continuing operations of approximately $0.17 for our third fiscal quarter ending June 30, 2002. For the fourth fiscal quarter ending September 30, 2002, we expect revenue from continuing

operations of approximately $29 million to $30 million and pro forma diluted earnings per share from continuing operations of $0.23 to $0.24.

For the next fiscal year ending September 30, 2003, we expect revenue from continuing operations to be approximately $130 million to $135 million and pro forma diluted earnings per share from continuing operations of approximately $1.00 (on a diluted share count of approximately 19.5 million average shares).  This fiscal 2003 guidance reflects an approximate 30% top line growth and an approximate 45% pro forma diluted earnings per share growth from continuing operations."

14.    Between May 22 and 24, 2002, defendant McCarty sold 69,416 Tier shares at $16.25-$16.63 per share.

15.    On July 25, 2002, the Company issued a press release entitled "Tier Reports Fiscal Third Quarter Results From Continuing Operations of $0.17 Pro Forma Diluted EPS and Revenues of $26.3 Million."  The press release stated in part:

Tier Technologies, Inc. announced financial results for the third fiscal quarter ended June 30, 2002.

Revenue from continuing operations for the third quarter increased approximately 19% to $26.3 million from $22.2 million in the quarter ended June 30, 2001.

Pro forma operating income from continuing operations increased approximately 58% to $4.6 million from $2.9 million in the prior year quarter.  Pro forma net income and pro forma diluted earnings per share from continuing operations were $3.2 million and $0.17, respectively, compared to $2.1 million and $0.15, respectively, in the prior year quarter.  As announced during Tier's second fiscal quarter, the Company intends to sell its Australian operations.  The financial results of Australian operations, the estimated future operating losses and the estimated loss on the sale continue to be presented as a discontinued operation, and have been excluded from current and prior year results from continuing operations for comparative purposes.

*      *      *

"Tier's third quarter results reflect the stability of our business model even in times of great economic uncertainty," noted James L. Bildner, Tier's Chairman and Chief Executive Officer.  ***Our business is solid and supported by long-term contracts in our core state and local government business which should cushion the impact of continued weakness in the economic environment surrounding today's commercial markets.  We remain optimistic about the strength of our business as a whole over the long term and believe we will see sustained growth over the next fiscal year," he said.***

*      *      *

***Tier has seen a continued trend in the state and local government sector in the use of pre-qualified vendors and master service agreements as a preferred procurement vehicle for purchasing services.  Tier announced this quarter that it had received approval under New York State's Personal Service Contract to***

*provide services to the New York State Office of Children and Family Services, the New York State Departments of Labor and Health, the New York State Office for Technology and the New York State Office of Temporary and Disability Assistance.  This agreement runs through August 31, 2004 and may be extended at the State's option for up to two years thereafter.*

**OUTLOOK**

*Bildner added, "As we look out into our fourth fiscal quarter, we expect that Official Payments' operating expenses will be slightly higher than our preliminary forecast made at the end of May, resulting in an additional $0.01 charge per diluted share.  We now expect that Official Payments will impact Tier's overall financial results by approximately a $0.02 pro forma net loss per diluted share, excluding merger-related transition costs of approximately $800,000 in the quarter.*

*As a result of our updated estimate of Official Payments' pro forma net loss per diluted share of approximately $0.02 for the fourth quarter, we now expect to generate pro forma diluted earnings per share from continuing operations of approximately $0.21, excluding merger-related transition costs.  We re-affirm our previous fourth quarter revenue guidance in the range of $32 million to $33 million which includes Official Payments estimated revenue in the fourth fiscal quarter of approximately $3 million.*

*For our fiscal year ending September 30, 2003, we expect to realize the benefits of the Official Payments merger as well as continued revenue growth from our other operations, particularly within our government business unit, and as a result we re-affirm our guidance as to consolidated revenue from continuing operations of between $165 million and $170 million and pro forma diluted earnings per share from continuing operations of approximately $1.05, excluding merger-related transition costs.  Pro forma diluted earnings per share from continuing operations assumes approximately 19.7 million in outstanding diluted shares for the 2003 fiscal year."*

16.    Between August 27 and September 10, 2002, defendant McCarty sold 51,802 Tier shares at $19.09-$19.99 per share.

17.    On November 7, 2002, the Company issued a press release entitled "Tier Reports Record Revenues of $32.4 Million and $0.20 Pro Forma Diluted EPS From Continuing Operations in Fourth Fiscal Quarter."  The press release stated in part:

Tier Technologies, Inc. announced financial results for the fourth fiscal quarter ended September 30, 2002.

Revenue from continuing operations for the fourth quarter increased approximately 39% to $32.4 million from $23.3 million in the quarter ended September 30, 2001.

Pro forma operating income from continuing operations increased approximately 28% to $5.3 million from $4.2 million in the prior year quarter.  Pro forma net income and pro forma diluted earnings per share from continuing operations were $3.8 million and $0.20, respectively, compared to $2.7 million and

$0.19, respectively, in the prior year quarter.  As announced in September, the Company completed the sale of its Australian operations.  The results of Australian operations and the loss on the sale are presented as a discontinued operation.  Current and prior year results from continuing operations exclude the impact of Australian operations for comparative purposes.

\*        \*        \*

"Tier's record revenue in the fiscal year and fourth quarter reflect significant growth in our government services business in particular," noted James L. Bildner, Tier's Chairman and Chief Executive Officer.  "With the sale of our Australian operations and the acquisition of Official Payments Corporation completed during the fourth quarter, we remain focused on the opportunities ahead to continue to grow our U.S. operations.  During the fourth fiscal quarter, 99% of our revenues are coming from the U.S. and 88% of our revenues are coming from government business.  We have seen significant growth in our U.S. business with quarterly revenues increasing 43% over the prior year quarter.  Our government business in the U.S. has shown dramatic growth and continues to be supported by long-term contracts in our core state and local government market.  This strong revenue growth has cushioned most of the weakness Tier has experienced in our commercial markets due to the overall economic environment.  We were also pleased with the progress we made in the integration of Official Payments Corporation and are encouraged by the year-over-year growth in dollars processed since our acquisition at the end of July."

\*        \*        \*

**OUTLOOK**

*"For our 2003 fiscal year, we are increasing our previous guidance reflecting the estimated value of recent contract wins.  Since our previous third quarter earnings release, we have announced approximately $83 million in contract awards many of which are multi-year .  For the year ending September 30, 2003, we now expect revenue of approximately $175 million to $185 million and pro forma diluted earnings per share of approximately $1.06 (assuming 20.4 million in average diluted shares for the fiscal year) excluding acquisition-related costs.  On a fiscal year basis, we expect average pro forma gross profit margin in the range of 38% to 39% of total revenue, sales and marketing expense in the range of 5% to 6% of total revenue and general and administrative expense in the range of 13% to 14% of total revenue," noted James L. Bildner.*

*"For the first quarter of fiscal 2003, we expect revenue to be in the range of approximately $32.5 million to $33.5 million and pro forma diluted earnings per share to range from $0.14 to $0.15.  Our guidance for the first quarter of fiscal 2003 reflects anticipated revenue growth of 41% to 46% compared to the prior year quarter and includes approximately $6 million of anticipated quarterly revenue from Official Payments Corporation*.

18.    On November 14, 2002, DePole sold 20,000 Tier shares at $15.35 per share.

19.    On January 23, 2003, the Company issued a press release entitled "Tier Reports $0.14 Pro Forma Diluted EPS for First Fiscal Quarter."  The press release stated in part:

–       Quarter Revenues Increased 40% Over Prior Year Quarter

–       Official Payments Achieved Positive EBITDA and Revenues Increased 43% Over Prior Year Quarter

... Tier Technologies, Inc. announced financial results for the first fiscal quarter ended December 31, 2002.

Revenue from continuing operations for the first quarter of fiscal year 2003 increased 40% to $32.2 million from $23.0 million for the quarter ended December 31, 2001.

Pro forma operating income from continuing operations for the first fiscal quarter was $3.9 million compared to $3.2 million in the prior year quarter.  Pro forma net income from continuing operations for the first quarter grew 30% as compared to the prior year quarter with pro forma net income and pro forma diluted earnings per share from continuing operations of $2.7 million and $0.14, respectively, compared to $2.1 million and $0.14, respectively, in the prior year quarter.  The Company completed the sale of its Australian operations in the prior fiscal year.  Results from continuing operations for the prior year quarter ended December 31, 2001 exclude the impact of Australian operations for comparative purposes.

*       *       *

*"Overall, it was another solid quarter for Tier.  Despite historic budget deficits at the state and local levels, we continue to see stability in our core markets.  This past quarter, we accomplished a number of important objectives, not the least of which was making significant strides towards the integration of OPAY, which we acquired in July 2002.  We were delighted with OPAY's financial results this quarter.  OPAY's revenues for the first fiscal quarter grew 43% as compared to the prior year quarter.  For the first fiscal quarter, OPAY had positive EBITDA (earnings before interest, taxes, depreciation and amortization) on a U.S. GAAP basis for the first time since 1999.  We are beginning to see the positive financial impact of the various integration and cost saving measures we are implementing at OPAY," stated James L. Bildner, Tier's Chairman and Chief Executive Officer*.

20.     On April 24, 2003, the Company issued a press release entitled "Tier Reports Results for Second Fiscal Quarter."  The press release stated in part:

Tier Technologies, Inc. announced financial results for the second fiscal quarter ended March 31, 2003.  Net revenue from continuing operations for the second quarter of fiscal year 2003 increased 51% to $33.2 million from $22.1 million for the quarter ended March 31, 2002.

Tier reported U.S. GAAP operating income from continuing operations of $2.3 million in the second fiscal quarter, a 23% decrease compared to $3.0 million in the prior year quarter.  U.S. GAAP after-tax income from continuing operations for the second quarter decreased 28% with U.S. GAAP after-tax income and diluted earnings per share from continuing operations for the second fiscal quarter of $1.6 million and $0.08, respectively, compared to $2.2 million and $0.11, respectively, in the prior year quarter.  The Company completed the sale of its Australian operations in the prior fiscal year.  Results from continuing operations for the period ended March 31, 2002 exclude the impact of Australian operations for comparative purposes.

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS                                    - 7 -

21.     On June 23, 2003, *Market News* issued a release entitled "Tier US: 8-K: TIER Receives Subpoena-Child Support Pmnt Processing."  The release stated in part:

> Tier Technologies Inc. ... filed an 8-K on 6/23, in which the Company reported that it received a subpoena from a grand jury in the Southern District of New York to produce certain documents pursuant to an investigation involving the child support payment processing industry by the United States Department of Justice, Antitrust Division.

22.     On August 1, 2003, the Company issued a press release entitled "Tier Reports Fiscal Third Quarter 2003 Results."  The press release stated in part:

> Tier Technologies, Inc. a leading consulting firm providing technology, business processing, and outsourced solutions for clients in the state and local government, healthcare, insurance, and utility vertical markets today announced results for the fiscal third quarter ended June 30, 2003.
>
> Revenues for the fiscal 2003 third quarter were $45.5 million, an increase of 73% as compared with $26.3 million in the same period a year ago and an increase of 37% compared with $33.2 million in the fiscal 2003 second quarter.
>
> Total cash and investments at June 30, 2003 totaled $69.0 million.  During the fiscal 2003 third quarter, Tier once again generated strong cash flow from operations of $4.5 million as compared to $3.3 million in the same period a year ago and $4.4 million in the fiscal 2003 second quarter.
>
> *        *        *
>
> Financial Outlook
>
> As noted above, Tier's transaction-based businesses have continued to perform well.  However, significant budget pressures at the state and local government levels have resulted in reduced spending, increased downward pressure on pricing and margins and project delays, cutbacks or postponements in new contract awards, particularly in the discretionary government spending areas.  In addition, as noted above, Tier experienced unexpected, additional project costs and expenses on a large systems integration project in the third quarter.  Should this delay continue in the future, revenues and costs associated with this project could vary.  The commercial business sector continues to exhibit weakness consistent with overall domestic IT spending.
>
> Taking all of these factors under consideration, Tier expects revenue in the fiscal fourth quarter to be in the range of $31.0 to $32.5 million.  GAAP earnings per diluted share for the fiscal fourth quarter are expected to be in the range of $0.02 to $0.03.  Pro forma earnings per diluted share for the fiscal fourth quarter is expected to be in the range of $0.09 to $0.10.  The difference between GAAP and pro forma earnings per diluted share relate to the exclusion of certain depreciation, amortization, and business combination charges equal to $.05 per diluted share.  Additionally, in the fourth quarter we anticipate $.02 per diluted share, excluding any insurance reimbursements, in additional other charges in connection with our compliance with the document production pursuant to the subpoena.

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS                          - 8 -

23.     On November 10, 2003, the Company issued a press release entitled "Tier Reports Fiscal Fourth Quarter Results." The press release stated in part:

Tier Technologies, Inc., a leading provider of financial transaction processing outsourcing and packaged software and systems integration solutions for state and local government clients, today announced results for the fiscal fourth quarter ended Sept. 30, 2003 and the full fiscal year 2003.

GAAP Results

U.S. Generally Accepted Accounting Principles, or GAAP, net loss from continuing operations per diluted share was $1.57 in the fiscal 2003 fourth quarter, as compared to net income from continuing operations per diluted share of $0.11 in the same period of a year ago. For the full year 2003, GAAP net loss from continuing operations per diluted share was $1.27, as compared to net income from continuing operations per diluted share of $0.45 a year ago.

*        *        *

CalPERS Charges

In addition to the effect on net revenues from CalPERS as described above, in the fiscal 2003 fourth quarter, the Company incurred $3.0 million in costs as compared with costs of $2.2 million in the same period a year ago. For the full 2003 fiscal year, the Company incurred $10.0 million in costs, as compared with costs of $7.2 million in fiscal year 2002.

Restructuring and Other Charges

As a result of Tier's decision reported today to exit its management consulting practice focused on the health care industry, its global insurance practice in the United Kingdom, the Tier Strategies practice, its Systems & Technology Training practice, and its Justice & Public Safety practice, the Company incurred $20.5 million of charges in the fourth quarter of fiscal 2003.

The Company also incurred $1.0 million of charges in the fourth quarter of fiscal 2003 in connection with the Company's compliance with the document production pursuant to the subpoena disclosed in June 2003. The Company also took a tax charge of $7.0 million in the fourth quarter of fiscal 2003 to establish deferred tax asset valuation allowances related to the net operating loss carry-forwards created as a result of the loss for fiscal 2003.

The Company has provided supplemental notes on the face of the attached condensed consolidated statements of operations that describe in detail the items affecting per share results and revenues reported above and a reconciliation of the pro forma results to the GAAP results.

For additional details regarding CalPERS and the effects of the Company's restructuring activities, please refer to the other press releases issued today.

**TIER'S FALSE FINANCIAL REPORTING DURING THE CLASS PERIOD**

24.    In order to inflate the price of Tier's stock, defendants caused the Company to falsely report its results for fiscal 2002 and the first three quarters of fiscal 2003 through improper revenue recognition on a contract with CALPERS wherein Tier did not fulfill its obligations, thereby materially overstating its revenue, net income and EPS for that quarter.  Tier's improper revenue recognition and failure to make adequate and timely provisions for losses on the contract allowed the Company to report favorable sales and earnings, in violation of GAAP and SEC rules.

25.    Tier reported the following amounts for the following quarters of fiscal 2002-2003:

|  | 3/31/02 | 6/30/02 | 9/30/02 | 12/31/02 | 3/31/03 | 6/30/03 |
|---|---|---|---|---|---|---|
| Net Sales | $22.1m | $26.3m | $28.0m | $32.2m | $33.2m | $45.5 |
| Net Income | $2.8m* | $2.4m | $3.8m* | $1.7m | $1.67m | $2.1m |
| E P S | $.15* | $.17 | $.20* | $.14 | $.13 | $.17 |

*  Pro forma excluding acquisition related costs.

26.    Tier included these results in its Form 10-Qs and 2002 Form 10-K filed with the SEC and signed by defendants.  The Form 10-Qs and Form 10-K represented that the financial statements included therein were a fair presentation of the information set forth therein.

27.    These representations were false and misleading when made, as Tier's financial statements were not a fair presentation of its results and were presented in violation of GAAP and SEC rules.

28.    GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time.  SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnote or other disclosure.  Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements.  17 C.F.R. §210.10-01(a).

29.     The Individual Defendants caused Tier to falsify its reported financial results through its improper recognition of revenue on a contract with CalPERS wherein Tier had not completed the contract to the terms of Tier's obligations.

30.     Tier represented the following with respect to its revenue recognition practices:

> The Company derives net revenues from professional consulting, IT consulting, transaction processing services and software license and maintenance fees. The Company generally bills clients on either a time and materials basis, a fixed price basis or a per-transaction basis. Net revenues pursuant to time and materials contracts are generally recognized as services are performed. Net revenues pursuant to fixed-fee contracts are generally recognized as services are rendered on the percentage-of-completion method of accounting (based on the ratio of costs incurred to total estimated project costs). Net revenues from transaction-based contracts are generally recognized based on fees charged on a per-transaction basis or fees charged as a percentage of dollars processed. Net revenues from software licenses that include significant implementation or customization services are recognized on the percentage-of-completion method of accounting. Net revenues from software licenses that do not include significant implementation or customization services are recognized upon delivery when the fees are fixed and determinable, collection is probable and vendor specific evidence exists to determine the value of any undeliverable elements of the arrangement. Net revenues from software maintenance contracts are recognized ratably over the term of the contract, typically one year.

> \*       \*       \*

> Provisions for estimated losses on uncompleted contracts are recognized in the period such losses become probable and can be reasonably estimated. To date, such losses have been insignificant. Most of the Company's contracts are terminable by the client following limited notice and without significant penalty to the client. The completion, cancellation or significant reduction in the scope of a large project would have a material adverse impact on the Company's business, financial condition and results of operations.

> Unbilled receivables arise on a contract when the cumulative net revenue recognized exceeds the cumulative amount billed in accordance with the contractual billing terms. Unbilled receivables were $16,475,000 and $11,803,000 at September 30, 2002 and 2001, respectively, of which $0 and approximately $1,091,000, respectively, is not billable for more than one year under the terms of the contracts and is included in other long-term assets. The current portion of the unbilled receivables balance is included in accounts receivable.

31.     GAAP, as described by FASB Statement of Concepts ("Concepts") No. 5, provides that revenue should not be recognized until it is both earned and is realizable.

32.     Pursuant to AICPA Statement of Position ("SOP"), 81-1 which sets forth the accounting for long term contracts, use of the percentage of completion method of accounting

1  requires that an entity be capable of making reasonable estimates of the work completed and requires

2  that both parties be expected to satisfy their obligations under the contract.  SOP 81-1.23.

3      33.    Moreover, whenever a loss is expected on a contract accounted for under the

4  percentage of completion method, it should be recorded immediately.  SOP 81-1.85.

5      34.    GAAP, as set forth in SFAS No. 5, Accounting for Contingencies, states that any loss

6  to be expected from a uncollectible receivable should be accrued when it is probable and when the

7  amount of such loss can be reasonably estimated.  *See* SFAS No. 5, ¶8.  According to SFAS No. 5,

8  ¶22:

> Losses from uncollectible receivables shall be accrued when both conditions
> in paragraph 8 are met.  Those conditions may be considered in relation to individual
> receivables or in relation to groups of similar types of receivables.  If the conditions
> are met, accrual shall be made even though the particular receivables that are
> uncollectible may not be identifiable.

12     35.    In early fiscal 2002, Tier entered into an agreement with CalPERS.  At the same time,

13 Tier greatly increased its use of percentage of completion accounting.  By the end of fiscal 2002,

14 percentage of completion accounting represented 47% of Tier's sales versus less than 28% in prior

15 years.  Also, by December 2002, unbilled receivables (representing revenues Tier recognized for

16 which it was not entitled to bill its customer) shot up to $18.7 million, 34% higher than the prior

17 December.  During the Class Period, Tier recognized at least $12.8 million in revenues under the

18 percentage of completion method for the contract with CalPERS to which the Company was not

19 entitled, due to its failure to comply with the contract.  During fiscal 2002, CalPERS represented

20 some 10.5% of Tier's revenues.

21     36.    The Individual Defendants knew that due to problems with the contract the

22 collectibility of receivables associated with CalPERS was in doubt, such that losses should have

23 been recorded in accordance with SFAS No. 5, as described above.

24     37.    Nevertheless, in violation of GAAP, the defendants determined to cause Tier to

25 recognize revenue where it had not earned the revenue and failed to record adequate reserves.

26     38.    As a result of the Company's improper acceleration of revenues and inadequate

27 allowances, Tier's fourth quarter fiscal 2003 results were adversely affected when Tier had to

28

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS              - 12 -

1  reverse some $12.8 million in revenues, indicating that revenue in prior quarters should not have

2  been recorded.

3      39.    Due to these accounting improprieties, the Company presented its financial results

4  and statements in a manner which violated GAAP, including the following fundamental accounting

5  principles:

6      (a)    The principle that interim financial reporting should be based upon the same

7  accounting principles and practices used to prepare annual financial statements was violated (APB

8  No. 28, ¶10);

9      (b)    The principle that financial reporting should provide information that is useful

10  to present and potential investors and creditors and other users in making rational investment, credit

11  and similar decisions was violated (FASB Statement of Concepts No. 1, ¶34);

12      (c)    The principle that financial reporting should provide information about the

13  economic resources of an enterprise, the claims to those resources, and effects of transactions, events

14  and circumstances that change resources and claims to those resources was violated (FASB

15  Statement of Concepts No. 1, ¶40);

16      (d)    The principle that financial reporting should provide information about how

17  management of an enterprise has discharged its stewardship responsibility to owners (stockholders)

18  for the use of enterprise resources entrusted to it was violated.  To the extent that management offers

19  securities of the enterprise to the public, it voluntarily accepts wider responsibilities for

20  accountability to prospective investors and to the public in general (FASB Statement of Concepts

21  No. 1, ¶50);

22      (e)    The principle that financial reporting should provide information about an

23  enterprise's financial performance during a period was violated.  Investors and creditors often use

24  information about the past to help in assessing the prospects of an enterprise.  Thus, although

25  investment and credit decisions reflect investors' expectations about future enterprise performance,

26  those expectations are commonly based at least partly on evaluations of past enterprise performance

27  (FASB Statement of Concepts No. 1, ¶42);

28

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS          - 13 -

(f)     The principle that financial reporting should be reliable in that it represents what it purports to represent was violated.  That information should be reliable as well as relevant is a notion that is central to accounting (FASB Statement of Concepts No. 2, ¶¶58-59);

(g)     The principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions was violated (FASB Statement of Concepts No. 2, ¶79); and

(h)     The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered was violated.  The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (FASB Statement of Concepts No. 2, ¶¶95, 97).

40.     Further, the undisclosed adverse information concealed by defendants during the Class Period is the type of information which, because of SEC regulations, regulations of the national stock exchanges and customary business practice, is expected by investors and securities analysts to be disclosed and is known by corporate officials and their legal and financial advisors to be the type of information which is expected to be and must be disclosed.

## FIRST CLAIM FOR RELIEF

### For Violation of §10(b) of the 1934 Act and Rule 10b-5 Against All Defendants

41.     Plaintiff incorporates ¶¶1-40 by reference.

42.     During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were materially false and misleading in that they contained material misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

43.     Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)     Employed devices, schemes, and artifices to defraud;

1        (b)     Made untrue statements of material facts or omitted to state material facts

2 necessary in order to make statements made, in light of the circumstances under which they were

3 made not misleading; or

4        (c)     Engaged in acts, practices, and a course of business that operated as a fraud or

5 deceit upon plaintiff and others similarly situated in connection with their purchases of Tier publicly

6 traded securities during the Class Period.

7      44.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of

8 the market, they paid artificially inflated prices for Tier publicly traded securities.  Plaintiff and the

9 Class would not have purchased Tier publicly traded securities at the prices they paid, or at all, if

10 they had been aware that the market prices had been artificially and falsely inflated by defendants'

11 misleading statements.

12      45.    As a direct and proximate result of these defendants' wrongful conduct, plaintiff and

13 the other members of the Class suffered damages in connection with their purchases of Tier publicly

14 traded securities during the Class Period.

15                        **SECOND CLAIM FOR RELIEF**

16                **For Violation of §20(a) of the 1934 Act**

                        **Against All Defendants**

17      46.    Plaintiff incorporates ¶¶1-45 by reference.

18

19      47.    The executive officers of Tier prepared, or were responsible for preparing, the

Company's press releases and SEC filings.  The Individual Defendants controlled other employees

20 of Tier.  Tier controlled the Individual Defendants and each of its officers, executives and all of its

21 employees.  By reason of such conduct, defendants are liable pursuant to §20(a) of the 1934 Act.

22                      **CLASS ACTION ALLEGATIONS**

23

24      48.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules

25 of Civil Procedure on behalf of all persons who purchased Tier publicly traded securities (the

"Class") on the open market during the Class Period.  Excluded from the Class are defendants,

26 directors and officers of Tier and their families and affiliates.

27

28

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS      - 15 -

1     49.    The members of the Class are so numerous that joinder of all members is

2 impracticable.  The disposition of their claims in a class action will provide substantial benefits to

3 the parties and the Court.  During the Class Period, Tier had more than 17 million Class B shares of

4 stock outstanding, owned by thousands of persons.

5     50.    There is a well-defined community of interest in the questions of law and fact

6 involved in this case.  Questions of law and fact common to the members of the Class which

7 predominate over questions which may affect individual Class members include:

8     (a)    Whether the 1934 Act was violated by defendants;

9     (b)    Whether defendants omitted and/or misrepresented material facts;

10     (c)    Whether defendants' statements omitted material facts necessary to make the

11 statements made, in light of the circumstances under which they were made, not misleading; and

12     (d)    Whether defendants knew or recklessly disregarded that their statements were

13 false and misleading.

14 **PRAYER**

15     WHEREFORE, plaintiff prays for judgment as follows: declaring this action to be a proper

16 class action; awarding damages, including interest; and such equitable/injunctive or other relief as

17 the Court may deem proper.

18 **JURY DEMAND**

19     Plaintiff demands a trial by jury.

20 DATED:  December 8, 2003        MILBERG WEISS BERSHAD

                          HYNES & LERACH LLP

21                   PATRICK J. COUGHLIN

22

23               _____

24                     PATRICK J. COUGHLIN

25               100 Pine Street, Suite 2600

               San Francisco, CA  94111

26               Telephone:  415/288-4545

               415/288-4534 (fax)

27

28

1

2    MILBERG WEISS BERSHAD
         HYNES & LERACH LLP
3    WILLIAM S. LERACH
     DARREN J. ROBBINS
4    401 B Street, Suite 1700
     San Diego, CA  92101
5    Telephone:  619/231-1058
     619/231-7423 (fax)

6    FARUQI & FARUQI, LLP
     NADEEM FARUQI
7    320 East 39th Street
     New York, NY  10016
8    Telephone:  212/983-9330
     212/983-9331 (fax)

9
     Attorneys for Plaintiff
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## CERTIFICATION OF INTERESTED ENTITIES OR PERSONS

2          Pursuant to Civil L.R. 3-16, the undersigned certifies that as of this date, other than the

3    named parties, there is no such interest to report.

4
                                                    _____
5                                                   ATTORNEY OF RECORD FOR
                                                    PLAINTIFF JACK SPERLING
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28